UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| National Railroad Passenger Corporation, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Civil Action No. 14-cv-678(GK) |
| | : | |
| Fraternal Order of Police, Lodge 189, | : | |
| | : | |
| Defendant. | : | |

## MEMORANDUM OPINION

Plaintiff National Railroad Passenger Corporation, best known as Amtrak ("Plaintiff" or "Amtrak"), brings this action to vacate an arbitration award under the Railway Labor Act, 45 U.S.C. § 151 et seq. ("RLA"), and the Inspector General Act of 1978, 5 U.S.C. App. 3 § 1 et seq. ("IG Act"). After a labor dispute between Amtrak and Defendant the Fraternal Order of Police, Lodge 189 ("Defendant" or "the FOP") involving one of the FOP's members, on March 24, 2014, an Arbitrator issued a Decision and Award in favor of the FOP. Arbitrator's Decision [Dkt. No. 22-1]. On April 22, 2014, Amtrak filed its Complaint and Petition to Vacate Arbitration Award under the Railway Labor Act [Dkt. No. 1], contending that the Arbitrator's Decision exceeded the scope of his jurisdiction

and violated public policy with respect to Amtrak Inspector General investigations and Amtrak police officer discipline.[1]

This matter is presently before the Court on Amtrak's Motion for Summary Judgment [Dkt. No. 23] and the FOP's Cross-Motion for Summary Judgment [Dkt. No. 25]. At the heart of the Parties' Cross-Motions is a single legal question: are procedural limitations on the conduct of internal investigations contained in a collective bargaining agreement between Amtrak and the FOP binding on the Amtrak Office of Inspector General? The Court concludes that they are not. Upon consideration of the Motions, Oppositions [Dkt. Nos. 25, 27], Replies [Dkt. Nos. 27, 28], the United States' Statement of Interest [Dkt. No. 26], and the entire record herein, and for the reasons stated below, Amtrak's Motion for Summary Judgment shall be **granted** and the FOP's Cross-Motion for Summary Judgment shall be **denied**.

---

[1] On July 9, 2014, Amtrak filed its First Amended Complaint [Dkt. No. 5], which raised the same core contentions as its initial Complaint. Amtrak's initial Complaint named FOP member and former Amtrak Police Department officer Sarah Bryant as a Defendant. Pl.'s Compl. ¶ 3. Amtrak's First Amended Complaint names only the FOP as a Defendant. Pl.'s First Am. Compl. ¶ 2.

I.   BACKGROUND

   A.   Factual and Procedural Background[2]

   In May of 2008, Sarah Bryant ("Bryant") joined the Canine

Unit of the Amtrak Police Department ("APD").

   On September 20, 2011, the Amtrak Office of Inspector General

("OIG") and APD's Internal Affairs Unit received anonymous

complaints that Bryant's supervisor, William Parker ("Parker"),

was assigning Bryant a disproportionate share of "surge overtime"

in the Canine Unit and that Bryant and Parker jointly owned a home

in Bowie, Maryland.

   On September 25, 2012, the OIG interviewed both Parker and

Bryant. At the interview, Bryant was apprised of her right to

remain silent in accordance with Garrity v. State of New Jersey,

385 U.S. 493, 500 (1967) (holding that statements obtained from

police officers under threat of termination for refusal to answer

could not be used in subsequent criminal proceedings). However,

_____

[2] The Parties agree that there are no facts in dispute. Statement
of Material Facts in Support of Plaintiff's Motion for Summary
Judgment at 1 n.1 [Dkt. No.23-2]; Statement of Facts in Support of
Defendant's Cross-Motion for Summary Judgment at 1 n.1 [Dkt. No.
25-1]. Accordingly, the facts that follow are drawn from the
Arbitrator's Decision at 1-22 [Dkt. No. 22-1].

   The Parties renumbered the pages of the Arbitrator's Decision
when they compiled the Joint Administrative Record [Dkt. No. 22].
Compare Arbitrator's Decision as submitted with Pl.'s Compl. [Dkt.
No. 1-1] with Arbitrator's Decision as submitted in the Joint
Administrative Record [Dkt. No. 22-1]. The Court follows the
pagination set out in the Joint Administrative Record.

"[s]he was not advised of any right to [u]nion counsel and/or representation, or given <u>Miranda</u> rights, and her interview was not recorded in any way." Arbitrator's Decision at 5. The OIG's failure to take these three steps would prove to be critical to the Arbitrator's disposition of Bryant's case.

On October 22, 2012, the OIG issued its report to the APD's Acting Chief of Police. The report stated that both Parker and Bryant had made false statements and omissions about their relationship and joint ownership of the Maryland home during their interviews with OIG and in previous interviews with APD Internal Affairs. The report also stated that Bryant and Parker's relationship created a conflict of interest, described various violations of Amtrak policy, and noted a likely violation of Maryland's criminal code. <u>See</u> Arbitrator's Decision at 5-7.[3]

On November 19, 2012, the Acting Chief of Police issued administrative charges against Bryant. On December 3, 2012, the APD gave Bryant the opportunity to resign rather than be terminated. She declined the offer and was terminated.[4]

On April 9, 2013, pursuant to the grievance procedure set forth in the Collective Bargaining Agreement ("CBA"), A.R. 259-

---

[3] The potentially criminal conduct occurred in 2005 and has never been prosecuted. Def.'s Reply at 1 n.1.

[4] Parker, likewise, was terminated.

-4-

320 [Dkt. No. 22-2], between Amtrak and Bryant's union, the FOP, Bryant appealed her termination to an Arbitrator. On November 15, 2013, Arbitrator Joan Parker (no relation to William Parker) held a hearing regarding Bryant's termination, and on January 31, 2014, Amtrak and the FOP submitted post-hearing briefs.

On March 24, 2014, the Arbitrator issued her Decision, holding that Amtrak did not have just cause to discharge Bryant. The Decision ordered Amtrak to reinstate Bryant to her prior position with her previous level of seniority, back pay, and retroactive payment of benefits. Arbitrator's Decision at 22.

The Arbitrator's Decision rests entirely on the OIG's failure to: 1) advise Bryant of her right to union representation; 2) read Bryant her Miranda rights; and 3) record her interview. A section of the CBA between Amtrak and the FOB contains extensive procedures that govern internal investigations of APD officers. Arbitrator's Decision at 3-4. This section, entitled "Rule 50-Police Officers Bill of Rights," includes the following relevant provisions:

> In an effort to ensure that these interrogations [of APD employees] are conducted in a manner which is conducive to good order and discipline, the following guidelines are promulgated:
> . . .
> 2. The employee shall be advised of his [or her] right to an adjournment in order to have the Organization's [i.e., FOP's] counsel (or his [or her] designee) and/or Organization representative present.
> . . .

4. If an employee is under arrest or is likely to be, that is, if he [or she] is a suspect or the target of a criminal investigation, he [or she] shall be given [their] rights pursuant to the <u>Miranda</u> decision.

. . .

7. The complete interrogation of the employee shall be recorded mechanically or by a stenographer. All recesses called during the questioning shall be noted. The employee or the Organization's counsel (or his [or her] designee) shall be entitled to a transcript of such stenographic record within a reasonable time after such interrogation.

8. The Department shall afford an opportunity for an employee, if he [or she] so requests, to consult with counsel and/or with a representative of the Organization before being questioned concerning a violation of the Rules and Regulations; provided the interrogation is not unduly delayed. The employee shall have the right to have the Organization's counsel (or his [or her] designee) and/or Organization representative present to assist him [or her] during the interrogation.

Arbitrator's Decision at 3-4.[5]

---

[5] Rule 50 of the Bill of Rights provides additional protections that go far beyond those afforded to members of the public who may interact with APD officers. For example, before any internal investigation -- including those involving suspected criminal conduct by APD officers -- the officer under investigation "shall be informed of the nature of the inquiry before any interrogation commences, including the name of the complainant." Arbitration Record at 300-01 [Dkt. No. 22-2]. "If it is known that an employee is the target of a criminal investigation or a witness only, he [or she] should be so informed at the initial contact." <u>Id.</u>

In contrast with oft-used interrogation tactics employed with suspects of criminal activity, Rule 50 requires that "[t]he interrogation of an employee shall be at a reasonable hour, preferably when the employee is on duty, unless the exigencies of the interrogation dictate otherwise." <u>Id.</u> Moreover, "[t]he questioning shall not be overly long. . . . Time shall also be provided for personal necessities, meals, telephone call(s) and rest periods as are reasonably necessary." <u>Id.</u> Finally, "[t]he employee shall not be subject to any offensive language, nor shall

Relying on the Railway Labor Act ("RLA"), 45 U.S.C. § 151 et seq., the Inspector General Act of 1978 ("IG Act"), 5 U.S.C. App. 3 § 1 et seq., and the Supreme Court's decision in Nat'l Aeronautics & Space Admin. v. Fed. Labor Relations Auth. ("NASA"), 527 U.S. 229 (1999), the Arbitrator concluded that Rule 50's protections apply to investigations conducted by the OIG. The Amtrak OIG is not specifically mentioned in Rule 50, and the OIG was not a signatory to the CBA. However, the Arbitrator reasoned that Amtrak agreed to the CBA containing Rule 50, and the OIG is a part of Amtrak, and, therefore, Rule 50 is binding on the OIG. Because the OIG failed to afford Bryant the benefits of Rule 50, the Arbitrator held that her termination was unwarranted.

On April 22, 2014, Amtrak filed its Complaint and Petition to Vacate Arbitration Award under the Railway Labor Act [Dkt. No. 1], contending, among other things, that the Arbitrator's application of Rule 50 to an OIG investigation violates the clearly established public policy of Inspector General independence reflected in the IG Act. On July 9, 2014, Amtrak filed its First Amended Complaint [Dkt. No. 5], which

---

he [or she] be threatened with transfer, dismissal or other disciplinary punishment. No promises or reward shall be made as an inducement to answering questions." Id.

contains substantially similar allegations. On September 26,
2014, Defendant FOP filed its Answer [Dkt. No. 9].

On July 10, 2015, Amtrak filed its Motion for Summary
Judgment [Dkt. No. 23], and on August 14, 2015, the FOP filed
its Combined Cross-Motion for Summary Judgment and Opposition
[Dkt. No. 25]. On September 11, 2015, Amtrak filed its
Combined Opposition and Reply [Dkt. No. 27]. On September 11,
2015, the United States filed a Statement of Interest [Dkt.
No. 26]. On October 9, 2015, the FOP filed its Reply [Dkt.
No. 28].

**B.    Statutory Background**

*1.    Inspector General Act*

Congress enacted the Inspector General Act of 1978 "to create
independent and objective units  . . .  to conduct and supervise
audits and investigations related to the programs and operations"
of federal agencies. 5 U.S.C. App. 3 § 2(1). Under the IG Act,
each agency's Inspector General is appointed by the President with
the advice and consent of the Senate, and is subject only to the
"general supervision" of the head of his or her agency or "the
officer next in rank below such head[.]" Id. § 3(a).

Although Inspectors General are supervised by the heads of
their respective agencies, they enjoy broad independence.
"Congress did not intend that the power of 'general supervision'

-8-

given to the two top agency heads could be used to limit or restrict the investigatory power of the Inspector General." U.S. Nuclear Regulatory Comm'n, Washington, D.C. v. Fed. Labor Relations Auth., 25 F.3d 229, 234 (4th Cir. 1994), as amended (June 21, 1994). Rather, Congress specified that "[n]either the head of the [agency] nor the officer next in rank below such head shall prevent or prohibit the Inspector General from initiating, carrying out, or completing any audit or investigation, or from issuing any subpena [sic] during the course of any audit or investigation." 5 U.S.C. App. 3 § 3(a).

In 1988, Congress expanded the Inspector General Act to create Offices of Inspector General in certain designated federal entities, including Amtrak. Pub. Law No. 100-504, 102 Stat. 2515 (Oct. 18, 1988). Congress vested these additional Inspectors General with the same investigative powers and independence as their forebears. 5 U.S.C. App. 3 § 8G(d)(1) (guaranteeing that the "head of the designated Federal entity shall not prevent or prohibit the Inspector General from carrying out, or completing any audit or investigation"); see also id. § 8G(g)(1) (incorporating the same investigative and subpoena powers provided under Section 6 of the IG Act).

### 2. Railway Labor Act

The RLA provides for the creation of CBAs between railway employees and management and the resolution of conflicts that arise under those agreements. See 45 U.S.C. § 151a. In establishing Amtrak, Congress made the publicly-owned passenger railroad subject to the provisions of the RLA and its statutory scheme for union representation and collective bargaining. See, e.g., Railway Labor Executives' Ass'n v. Nat'l R.R. Passenger Corp., 691 F. Supp. 1516, 1519 (D.D.C. 1988) ("Relations between the unions and Amtrak are governed by the Railway Labor Act[.]"); Abdul-Qawiy v. Nat'l R.R. Passenger Corp., 2005 WL 3201271, at *1 (D.D.C. Oct. 25, 2005) ("Amtrak is a common carrier subject to the provisions of the Railway Labor Act[.]").

Section 3 First (q), of the Railway Labor Act provides that any employee or carrier "aggrieved by any of the terms of an award" issued by an arbitrator under the Act may file a petition for review in United States District Court. See 45 U.S.C. § 153 First (q). The RLA also provides that the findings of an arbitrator may be set aside "for failure . . . to comply with the requirements of this chapter, for failure of the order to conform, or confine itself, to matters within the scope of the [arbitrator's] jurisdiction, or for fraud or corruption by a member of the [panel] making the order." Id.

-10-

## II.   STANDARD OF REVIEW

Summary judgment may be granted only if the moving party has shown that there is no genuine dispute of material fact and that the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986); Waterhouse v. Dist. of Columbia, 298 F.3d 989, 991 (D.C. Cir. 2002). As already noted, the Parties agree that there are no facts in dispute. Statement of Material Facts in Support of Pl.'s Mot. for Summ. J. at 1 n.1; Statement of Facts in Support of Def.'s Cross-Mot. for Summ. J. at 1 n.1. Accordingly, the Court need only determine whether either Party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a).

## III. ANALYSIS

Amtrak contends that the Court must vacate the Arbitrator's Decision and Award because the Decision conflicts with the public policy underlying the IG Act, 5 U.S.C. App. 3 § 1 et seq.[6] Amtrak's principal argument is that, contrary to the Arbitrator's Decision,

---

[6] Amtrak raises two arguments in the alternative. First, it contends that by relying on the IG Act and Supreme Court precedent, the Arbitrator exceeded the jurisdiction conferred on her by the RLA. Second, Amtrak contends that because the OIG report implicated Bryant in potentially criminal conduct, Bryant's reinstatement to her former position would conflict with the public policy of maintaining a law-abiding police force. Because the Court holds that the Arbitrator's Decision conflicts with the established public policy of Inspector General independence, it need not reach Amtrak's secondary argument.

the investigatory powers of Inspectors General cannot be altered or regulated by collective bargaining agreements because, if they could, Inspectors General would lose the independence Congress set out to give them. Thus, according to Amtrak, the Arbitrator's Decision, which is predicated entirely on application of the CBA's Rule 50 to the Amtrak OIG, conflicts with clearly articulated Congressional policy.

## A.   Review under the RLA

The standard applicable to judicial review of arbitration awards under the Railway Labor Act is "among the narrowest known to the law[.]" Union Pac. R.R. v. Sheehan, 439 U.S. 89, 91 (1978). However, while review under the RLA is limited, the Courts still play a role. The RLA itself specifies three grounds on which arbitration awards may be overturned: "[1] failure . . . to comply with the requirements of [the RLA], [2] [] failure   . . .  to conform, or confine [an order], to matters within the scope of the [arbitrator's] jurisdiction, or [3] for fraud or corruption by a member of the [panel] making the order."   45 U.S.C. § 153 First (q).

Our Court of Appeals has made clear that courts must also set aside arbitration decisions and awards that are contrary to a well-defined and dominant public policy. Nw. Airlines, Inc. v. Air Line Pilots Ass'n, Int'l, 808 F.2d 76, 83 (D.C. Cir. 1987); see also

<u>Office & Prof'l Employees Int'l Union, Local 2 v. Washington Metro.</u>
<u>Area Transit Auth.</u>, 724 F.2d 133, 140 (D.C. Cir. 1983) ("[C]ourts
will not enforce an award that is contrary to law or explicit
public policy.").

However, review on public policy grounds, like review under
the RLA's explicit provisions, is also narrow. <u>Nw. Airlines</u>, 808
F.2d at 83. An award may be overturned on public policy grounds
only if "the public policy in question [is] well-defined and
dominant, and [may] be ascertained by reference to the laws and
legal precedents and not from general considerations of supposed
public interests." <u>Id.</u> (internal citation and quotation marks
omitted); accord <u>E. Associated Coal Corp. v. United Mine Workers</u>
<u>of Am., Dist. 17</u>, 531 U.S. 57, 63 (2000) (courts must consider
whether enforcement of award would "run contrary to an explicit,
well-defined, and dominant public policy, as ascertained by
reference to positive law and not from general considerations of
supposed public interests"); <u>Union Pac. R.R. Co. v. United Transp.</u>
<u>Union</u>, 3 F.3d 255, 258 (8th Cir. 1993), <u>cert.</u> <u>denied</u>, 510 U.S.
1072 (1994) ("federal courts possess authority to vacate
arbitration awards under the Railway Labor Act on public policy
grounds . . . when those awards violate well-defined and dominant
public policies.").

-13-

**B.   Collective Bargaining and the Inspector General**

The public policy that Amtrak cites -- that the Inspector General's investigative powers may not be regulated or abridged by CBAs -- is an explicit, well-defined, and dominant public policy. The independence of Inspector Generals is at the heart of the IG Act, see, e.g., 5 U.S.C. App. 3 § 8G(d)(1) (prohibiting agency head from preventing or prohibiting Inspector General investigations).  Our Court of Appeals and the Court of Appeals for the Fourth Circuit have spoken directly to the question the parties present: "[P]roposals concerning Inspector General-investigation procedures are not appropriately the subject of [collective] bargaining, because to allow such bargaining would impinge on the statutory independence of the I[nspector] G[eneral]." See U.S. Dep't of Homeland Sec. U.S. Customs & Border Prot. v. Fed. Labor Relations Auth. ("DHS"), 751 F.3d 665, 668 (D.C. Cir. 2014); accord U.S. Nuclear Regulatory Comm'n v. Fed. Labor Relations Auth. ("NRC"), 25 F.3d 229, 234 (4th Cir. 1994).

The controversy in DHS, 751 F.3d at 666, centered on the Department of Homeland Security's refusal to negotiate with a bargaining unit representing employees of Customs and Board Protection (an agency within the Department) over the procedures the Department's OIG would use to conduct employee interviews. The

-14-

bargaining unit's proposal at issue in <u>DHS</u> closely mirrored Rule
50. It provided:

> that union officials receive advance notice of employee
> interviews; that interviews be conducted at the
> worksite; that employer representatives act
> professionally; that the employer representatives
> provide employees with specific negotiated forms with
> their rights outlined prior to conducting the interview;
> and that employer representatives advise employees of
> their right to union representation if the employee may
> be subject to discipline or adverse action before the
> interview is conducted.

<u>Id.</u> The bargaining unit explained that the purpose of "the
provision at issue [wa]s to obligate all employer representatives
to adhere to the[] negotiated provisions when conducting
investigatory interviews (criminal and noncriminal) of [Customs
and Border Protection] bargaining unit employees." <u>Id.</u>
Additionally, the proposal "specifically identifie[d] employees
from [the Department of Homeland Security's] OIG as employer
representatives when they conduct these investigations of CBP
employees[.]" <u>Id.</u>

Citing the clear statutory foundation of Inspector General
independence, our Court of Appeals upheld the Department's refusal
to consider the union's proposal, holding that proposals to
regulate OIG investigations authorized by the IG Act are not proper
subjects of collective bargaining. <u>Id.</u> at 671-72 (citing 5 U.S.C.
App. 3 § 2).

-15-

The Court also noted that "[t]he important point . . . is not that particular negotiated procedures interfere with specific aspects of OIG authority under the Inspector General Act but, rather, that negotiation in and of itself is antithetical to OIG independence established by the Inspector General Act." Id. at 672 (internal quotation marks and citation omitted); see also id. at 672-73 ("To allow the [agency] and the Union, which represents the [agency's] employees, to bargain over restrictions that would apply in the course of the Inspector General's investigatory interviews in the agency would impinge on the statutory independence of the Inspector General. . . . [Proposals] establishing employee rights and procedures for conducting investigatory interviews are therefore inconsistent with the Inspector General's independence and the Inspector General Act." (quoting NRC, 25 F.3d at 234)).

Notably, the DHS Court was careful to distinguish NASA, 527 U.S. 229, the Supreme Court opinion heavily relied upon in the Arbitrator's Decision in this case. In NASA, the Supreme Court held that OIG investigators were agency "representatives" for the purposes of certain statutorily guaranteed rights of union members. 527 U.S. at 246. NASA's holding formed the basis for the Arbitrator's ruling that OIG is bound by Amtrak's CBA with the FOP because it is part of Amtrak. Arbitrator's Decision at 21.

However, as DHS makes clear, NASA cannot be stretched that far. Instead, the DHS Court stated that the holding in NASA goes only so far as to protect certain rights explicitly guaranteed by statute. DHS, 751 F.3d at 671. "[T]he [Supreme] Court's decision in NASA certainly does not suggest that OIG investigations can be regulated . . . pursuant to the terms of a collective bargaining agreement." Id.[7]

In short, DHS makes clear that the IG Act's public policy of Inspector General independence would be violated if CBAs could restrict an Inspector General's investigative authority. Because the Arbitrator's Decision would subject the Amtrak OIG's investigative powers to limitations contained in a CBA—not a statute--there is no question that the Decision is contrary to the public policy underlying the IG Act. Thus, the Arbitrator's Decision cannot stand.[8]

---

[7] The Supreme Court even acknowledged in NASA that the question of whether a collective bargaining agreement could affect an Inspector General's investigative powers was not before it. 527 U.S. at 244 n.8. Moreover, the Court approvingly cited the Fourth Circuit's earlier opinion holding that an agency "could not bargain over certain procedures by which its OIG conducts investigatory interviews." Id. (citing NRC, 25 F.3d 229).

[8] The Court notes that the United States Government filed a Statement of Interest on September 11, 2015 [Dkt. No. 26]. The Government stated that the arbitrator had, in its view, committed legal error "because Inspectors General cannot be bound by any collective bargaining agreement purporting to place substantial limits on their investigative authority." The Government also stated that the "arbitrator misread NASA." Finally, the Government

## C.   Retroactive Application of Judicial Decisions

The FOP argues that despite the clear conflict between DHS and the Arbitration Decision, the DHS Court's judgment does not justify overturning the Arbitrator's Decision because DHS was not decided until three months after the arbitration was completed. The Court disagrees.

First, although DHS had not yet been decided, the policy it articulates was already firmly established. The policy of Inspector General independence is made clear in the IG Act itself. See e.g., 5 U.S.C. App. 3 § 8G(d)(1) ("the head of the designated Federal entity shall not prevent or prohibit the Inspector General from initiating, carrying out, or completing any audit or investigation, or from issuing any subpena [sic] during the course of any audit or investigation"). Moreover, twenty years ago in 1994, the United States Court of Appeals for the Fourth Circuit had reached the same conclusion as the DHS court. NRC, 25 F.3d 229; see also NASA, 527 U.S. at 244 n.8 (favorably citing NRC in footnote).

Second, the FOP's contention that this Court should not apply what is now clearly binding precedent is simply incorrect. The

relied upon the conclusion in DHS v. FLRA that "proposals concerning Inspector General-investigation procedures are not 'appropriately the subject of bargaining,' because to allow such bargaining 'would impinge on the statutory independence of the IG.'" DHS, 751 F.3d at 668.

Supreme Court has said that "[w]hen [it] applies a rule of federal law to the parties before it, that rule is the controlling interpretation of federal law and must be given full retroactive effect in all cases still open on direct review and as to all events, regardless of whether such events predate or postdate our announcement of the rule." Harper v. Virginia Dep't of Taxation, 509 U.S. 86, 97 (1993) ("adopt[ing] a rule that fairly reflects the position of a majority of Justices in [James B. Beam Distilling Co. v. Georgia, 501 U.S. 529 (1991)]").

There is no doubt that this Court must take the same approach to decisions of our Court of Appeals. United States v. McKie, 73 F.3d 1149, 1152 (D.C. Cir. 1996) (noting that "[l]itigants, either civil or criminal, may [] take advantage of judicial modifications in the law that are announced before they have exhausted their direct appeals"). As the Court of Appeals wrote in Nat'l Fuel Gas Supply Corp. v. F.E.R.C.,

> Because the decision of an Article III court announces the law as though it were finding it -- discerning what the law is, rather than decreeing what it is changed to, or what it will tomorrow be, all parties charged with applying that decision, whether agency or court, state or federal, must treat it as if it had always been the law. The agency must give retroactive effect to the ruling of a federal court because of the nature of that court. Just as an Article III court may not issue an advisory decision, it may not issue a decision for less than all seasons, for some citizens and not others, as an administrator shall later decide. In sum, the decision of a federal court must be given retroactive

> effect regardless whether it is being applied by a court
> or an agency.

59 F.3d 1281, 1289 (D.C. Cir. 1995) (internal brackets, ellipses,

citations, and quotation marks omitted).

### D.   Showing Required

The FOP also contends that Amtrak has failed to specifically

show how Rule 50 would interfere with OIG's investigative

authority. This argument misses the mark. As the <u>DHS</u> court

explained, "[t]he important point [] is <u>not that particular</u>

<u>negotiated procedures interfere</u> with specific aspects of OIG

authority under the Inspector General Act but, rather, that

<u>negotiation in and of itself is antithetical to OIG independence</u>

established by the Inspector General Act." <u>DHS</u>, 751 F.3d at 672

(emphasis added) (internal quotation marks and citation omitted).

Thus, Amtrak need not show precisely how Rule 50 would burden the

OIG. It is enough to nullify the Arbitrator's Decision that, if

the Decision were enforced, Rule 50 would regulate the OIG's

conduct during employee interviews.

## IV.   CONCLUSION

For the foregoing reasons, Amtrak's Motion for Summary Judgment shall be **granted**, the FOP's Cross-Motion for Summary Judgment shall be **denied**, and the Arbitrator's Decision and Award shall be **vacated**.


November _2_ , 2015

Gladys Kessler
United States District Judge

**Copies to:** attorneys on record via ECF

-21-